2019 IL App (1st) 153196-U

No. 1-15-3196

Filing Date August 30, 2019

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 13 CR 21485 |
| | ) | |
| NOAH N. WILBURN, | ) | |
| | ) | Honorable Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HALL delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*: This court affirmed defendant's first degree murder conviction where: defendant's argument that the prosecutor's improper argument denied him a fair trial was forfeited, and defense counsel was not ineffective. We rejected defendant's argument that his 53-year sentence violated the Eighth Amendment of the United States Constitution and found that his proportionate penalties argument should be raised in postconviction or in section 2-1401 of the Code of Civil Procedure proceedings. Finally, since the record did not reflect that the trial court gave consideration to defendant's age in sentencing him, we vacated defendant's sentence and remanded for resentencing.

¶ 2    Following a jury trial, defendant Noah N. Wilburn was found guilty of first degree murder and aggravated unlawful use of a weapon in connection with the death of Brandon Wilborn. The trial court sentenced defendant to consecutive sentences of 50 years' imprisonment for first

degree murder and 3 years' imprisonment for aggravated unlawful use of a weapon. On appeal, defendant contends (1) the State's improper argument denied him a fair trial, (2) he was denied the effective assistance of counsel, and (3) his 53-year sentence was a *de facto* life sentence and violated the Eighth Amendment of the United States Constitution (U.S. Const., amend. VIII), the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11) and was excessive.

¶ 3                               BACKGROUND

¶ 4   The chain of events leading to the death of Brandon Wilborn (Brandon) began on September 30, 2013. On that date, defendant, who turned 18 years old on September 14, 2013, Andrell Bell (Andrell), Aaron Campbell (Aaron) and Brandon, were standing outside Aaron's house. Defendant took Andrell's cell phone from her car. When Brandon and Andrell realized what defendant had done, they tried unsuccessfully to get the phone back from him. Defendant escaped by jumping into Aaron's car as Aaron was leaving.

¶ 5     On October 1, 2013, Brandon, Cortez Wingo (Cortez) and Andrell confronted defendant at his parents' house seeking the return of the cell phone. Cortez had a .40 caliber semiautomatic gun that he kept in his car. Brandon carried Cortez's gun in his hand. During the confrontation, the gun was always in plain sight, never in Brandon's pocket. Brandon did not point the gun at defendant, just held it at his side. Brandon told defendant to give the phone back " 'or else.' "

¶ 6                               JURY TRIAL

¶ 7                               For the State

¶ 8   Aaron, Cortez, and Keenan Hollingsworth (Keenan), friends and/or acquaintances of Brandon and defendant, witnessed defendant's shooting of Brandon and testified for the State. Their testimony was consistent in recounting the circumstances of the shooting and is summarized below.

2

¶ 9   On October 11, 2013, around 4:30 p.m., a white Monte Carlo dropped defendant off at Aaron's residence and left. Defendant asked Aaron to hold a .38 special caliber gun for him. Aaron placed the gun in the waistband of his pants. The Monte Carlo returned and parked in the driveway of Aaron's residence. Aaron recognized only one of the three persons in the Monte Carlo, Charles Harris. Shortly thereafter Cortez arrived with Brandon in Cortez's silver Oldsmobile and parked on the street in front of Aaron's house.

¶ 10   Brandon approached defendant, who was standing on the driveway, and tried to shake his hand, but defendant batted it away. As Brandon turned away from defendant to speak to someone, defendant punched him in the back of the head. Brandon had not threatened the defendant, and he did not respond physically to defendant's blow. Brandon had no weapons in his possession. A physical altercation between defendant and Brandon ensued, lasting six to seven minutes. When they stopped, Brandon again tried to shake defendant's hand. When defendant refused to shake hands, they began to argue. At this point, Aaron's friend Keenan arrived.

¶ 11   Both defendant and Brandon talked about guns. Cortez heard defendant say he would fight and shoot, and started asking people for a gun. According to Aaron, Brandon told the defendant, "I'm fittin getting in my car going to get my gun." Keenan heard Brandon say that if defendant did not shut up, he would get something to shut defendant up. Brandon then jumped into Cortez's Oldsmobile and drove down the street but not in the direction of where he lived. Defendant begged Aaron to give him his gun back, but Aaron refused until he saw Brandon returning. Knowing Brandon was upset with defendant for taking Andrell's cell phone, Aaron returned the gun to defendant thinking he wanted it for protection rather than to use it, but he did not really know the reason. Defendant placed the gun in his waistband. Less than a minute elapsed between the time Brandon left and returned to Aaron's house.

¶ 12   Brandon exited the Oldsmobile and walked up the driveway to the Monte Carlo. As Brandon

leaned on the Monte Carlo, defendant walked toward him very quickly. Defendant's hands were clutching the gun in his waist band. When the two men were face-to-face, Brandon noticed the gun and tried to grab defendant's arm. Defendant grabbed Brandon's arm and fired one shot at Brandon, striking him in the groin area. Still face-to-face, defendant shot Brandon a second time, hitting him in the stomach. Defendant was looking right at Brandon when he fired. As Brandon fell forward, defendant stood over him and fired a third shot into his back. At the time of the third shot, Brandon was not moving or reaching for defendant.

¶ 13    Defendant left the scene, running towards the back of Aaron's house. Aaron and Cortez placed Brandon in the Oldsmobile and drove him to the hospital.

¶ 14    Aaron, Keenan, and Cortez all testified that Brandon did not have a weapon. Watching Brandon exit the Oldsmobile and walk to the Monte Carlo, Aaron could see Brandon had nothing in his hands, and he did not see any weapons on Brandon. After defendant fired the third shot into Brandon, Keenan described defendant looking up and licking his lips, with a grin on his face. Cortez confirmed that there were no guns in the Oldsmobile on the day of the shooting. Just before the shooting, defendant was within arm's reach of Brandon when Cortez heard him tell Brandon "I'm gonna show you something like I'm showing you how to use a gun." Defendant then pulled a gun out of his pocket with his right hand. According to Cortez, a few days prior to October 11, 2013, a group of people, including Brandon, defendant, Aaron and Keenan, were standing on the driveway of Brandon's house. The group was having a good time, drinking and talking. There was no trouble on that occasion.

¶ 15  An autopsy performed by Dr. Young M. Kim, a pathologist, revealed that Brandon sustained three gunshot wounds: a contact wound, a close-up wound and a long-distance wound. Dr. Kim determined the cause of death to be the long-distance gunshot wound to Brandon's left shoulder, which caused extensive chest and abdominal injuries, and the close-up gunshot wound to his left

chest, which caused abdominal injuries with interperineal hemorrhages. He further determined that the manner of death was homicide. A .38 special caliber revolver in poor condition was found in the wooded area to the east of Aaron's house. A piece of wood had been stuffed into the barrel of the revolver. Expert testimony established that the two bullets recovered from Brandon's body and the three fired cartridge cases were from the same .38 special caliber revolver recovered by police.

¶ 16                                    For Defendant

¶ 17    Defendant testified that he shot Brandon in self-defense because he was afraid Brandon was going to kill him. His fear of Brandon was based on his interactions with Brandon prior to the shooting. The two were not friends; Brandon always had "a bone to pick" with him. A year and half prior to the shooting, Brandon and defendant had a physical confrontation stemming from an argument, and Brandon headed-butted defendant in the mouth. Defendant admitted taking Andrell's cell phone, which he sold for $150 because he needed the money. The next day, Brandon confronted him about the theft of the cell phone while holding a black semiautomatic handgun. Brandon told defendant that he should shoot him. After defendant told Brandon that he would talk to him if he put the gun away, Brandon agreed and put the gun in Cortez's car. Brandon told defendant that he needed to have the cell phone or the money for it the next time they saw each other.

¶ 18    When defendant arrived at Aaron's house on October 11, 2013, he did not have a gun. He knew that Aaron had a .38 caliber gun in his house. Brandon arrived with Cortez in the Oldsmobile. Defendant and Brandon exchanged words but did not resolve their differences. Brandon did not try to shake his hand. The two men removed their shirts and began to fight. After about five minutes, they stopped fighting but continued to exchange comments, defendant telling Brandon that he was only mad because defendant had bested him in the fight. Brandon told Cortez to give him the keys to the Oldsmobile saying "I'm fittin to go grab the gun and shut shorty goofy ass up."

5

Defendant had no weapons on him. Before Brandon drove off, he opened the trunk and appeared to be searching for something. Defendant told Aaron to get the gun because Brandon was going to shoot him, and he had nowhere to go. Defendant explained he could not go inside Aaron's house because he did not want Aaron's family members to be placed in danger. Brandon drove off in the direction of defendant's house but returned in about 15 seconds and parked the Oldsmobile in the same spot.

¶ 19    Aaron brought the gun from the house and handed it to defendant who held in his left hand, which he described as his dominant hand. He held the gun so that it could be seen but not pointed or threatening. Defendant just wanted Brandon to "back off." Exiting the Oldsmobile, Brandon turned his back preventing defendant from seeing what he was doing. As Brandon started up the driveway, he had his hands in his pockets. Thinking that Brandon was going to kill him, defendant pulled the gun he held into the open but pointing down. As Brandon got closer to him, defendant saw a bulge in Brandon's pants' pocket and thought it was a gun because Brandon said he was going to get a gun, and Brandon possessed a gun when they argued about the cell phone.

¶ 20    Brandon came within three or four feet of defendant, taking his hands out of his pockets. He did not try to shake defendant's hand. Defendant pointed the gun to the right, but looked to his left and fired. Brandon lunged forward at him, touching his left forearm. Defendant snatched his left arm back. The gun went off, and Brandon fell to one knee. One of Brandon's hands was up as if he was trying to take defendant's gun. Brandon's other hand was by the pocket where defendant believed he had a gun. Defendant was afraid that Brandon would grab defendant's gun or pull his own gun from his pocket. Defendant claimed the second shot was an accident but acknowledged that his finger was on the trigger of the gun. When he fired the gun a third time, defendant knew the gun was pointed down at Brandon, but he did not aim it at him. Defendant denied standing over Brandon and shooting him as he lay on the ground.

¶ 21    Defendant explained that he ran to the woods behind Aaron's house because he feared that Brandon's friends would get Brandon's gun and chase after him. After he saw Cortez's car leave, he threw the gun he used to shoot Brandon into the woods because he did not want it on him as he was not wearing a shirt. Defendant then walked to his parents' house. Later, the police arrested him as he left the house through a window.

¶ 22   After his arrest on October 11, 2013, defendant was interviewed several times by detectives. Because he was in shock and afraid to talk about what happened, at first defendant denied that he had been at Aaron's house and denied having a physical altercation with Brandon. He tried to blame Aaron for the shooting. Defendant explained he lied because he was in denial about the shooting. Defendant denied telling Detective Mitch Growe of the Calumet City police department that he refused Brandon's offer to shake hands with him, and he maintained he told Detective Growe that he saw the outline of a gun in Brandon's pocket. But after viewing the videotape[1] of his interview, defendant admitted telling the detective that he would not shake hands with Brandon because they were not friends, and he admitted telling the detective that he had looked but did not see a gun. Defendant explained that he meant he did not see a gun but saw an outline of a gun.

¶ 23   Nathan Wilburn, defendant's father, testified that in early October 2013, he observed a man looking in the windows of his residence. The man told Mr. Wilburn that he was looking for defendant. The next day, Mr. Wilburn learned that the man was Brandon. Aaron testified that in the summer of 2011, he observed defendant and Brandon fighting across from his house. Defendant's lip was injured, and someone told Aaron that Brandon had head-butted defendant in the lip.

¶ 24                                State's Rebuttal

---

[1]  According to defendant's counsel, efforts to obtain the videotape were unsuccessful.

¶ 25    Detective Growe denied that defendant told him that he saw the imprint of a gun or the outline of a gun in Brandon's pocket. When the detective asked him specifically whether Brandon had a gun, defendant told him he did not see a gun. Detective Growe did not ask defendant if he saw an imprint of a gun on Brandon, and defendant did not volunteer that information.

¶ 26                                        Verdict and Sentencing

¶ 27  Following closing arguments, the trial court instructed the jury on first degree murder, self-defense and second degree murder. Following deliberations, the jury returned verdicts finding defendant guilty of first degree murder and aggravated unlawful use of a weapon.

¶ 28    Defendant's motion for a new trial was denied, and the trial court sentenced defendant to a total of 53 years' imprisonment. This appeal followed.

¶ 29                                        ANALYSIS

¶ 30                                    I. Closing Arguments

¶ 31    Defendant contends that, considered either individually or cumulatively, the prosecutor's remarks in closing and rebuttal argument denied him a fair trial by misstating the law and the burden of proof. He acknowledges his claims of error are forfeited because his trial attorney did not object to those portions of the closing argument that he now complains of and did not raise them in his motion for a new trial. Defendant requests that we review his claims under the plain-error doctrine. Illinois Supreme Court Rule 615(a) (eff. Aug. 27, 1999).

¶ 32                                    A. Plain-Error Review

¶ 33     "The plain error doctrine is applicable when ' "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." ' "

*People v. Clark*, 2016 IL 118845, ¶ 42 (quoting *People v. Thompson*, 238 Ill. 2d 598, 613 (2010), quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Remedial application of the plain error doctrine is discretionary. *Clark*, 2016 IL 118845, ¶ 42; Ill. S. Ct. Rule 615(a) (eff. Aug. 27, 1999) (plain errors may be noticed although they were not brought to the attention of the trial court). Under both prongs of the plain error doctrine the defendant bears the burden of persuasion. *Piatkowski*, 225 Ill. 2d at 565. Our first task under the plain error doctrine is to determine if a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 34                                    B. Did Error Occur

¶ 35    To determine whether error occurred, we examine the complained-of statements in light of the provisions of the respective statutes.

¶ 36                                    1. *Statutory Provisions*

¶ 37                                    a. First Degree Murder and Self Defense

¶ 38    Defendant was charged with first degree murder in connection with Brandon's death. 720 ILCS 5/9-1(a)(1)(2) (West 2012). For first degree murder, the statute requires that the acts that result in death were committed "without lawful justification." 720 ILCS 5/9-1(a) (West 2012). The burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder. 720 ILCS 5/9-2(c) (West 2012).

¶ 39    While acknowledging that he fired the shots that killed Brandon, defendant maintained that he acted in self-defense, *i.e.*, he reasonably believed that such force was necessary to prevent imminent death of great bodily harm to himself. 720 ILCS 5/7-1 (West 2012). In raising the affirmative defense of self-defense, a defendant is required to present some evidence of each element of the defense: (1) force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the force threatened was unlawful, (5) the defendant actually believed that a danger existed, that force was necessary to avert the danger, and

the amount of force he used was necessary, and (6) that the beliefs were reasonable. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 32. If a defendant presents some evidence on each of the statutory elements, the burden shifts to the State to disprove the defense beyond a reasonable doubt. *Bennett*, 2017 IL App (1st) 151619, ¶ 33.

¶ 40                                    b. Second Degree Murder and Imperfect Self-Defense

¶ 41    " '[T]he elements of first degree and second degree murder are identical, and it is the presence of statutory mitigating factors that reduces an unlawful homicide from first degree to second degree murder.' " *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 153 (quoting *People v. Thompson*, 354 Ill. App. 3d 579, 587 (2004)).

¶ 42    Section 9-2 of the Code provides for two forms of second degree murder, the second of which is pertinent to this case and occurs when: "at the time of the killing he or she believes the circumstances to be such that if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code,[2] but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2012). "This second form of second-degree murder is known as imperfect self defense, and 'occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable.' " *Castellano*, 2015 IL App (1st) 133874, ¶ 148 (quoting *People v. Jeffries*, 164 Ill 2d 104, 113 (1995)). The defendant must prove the existence of the mitigating factor by a preponderance of the evidence before he can be found guilty of second degree murder. 720 ILCS 5/9-2(c) (West 2012).

¶ 43                                    2. *Alleged Improper Arguments*

¶ 44 The prosecutor has wide latitude during closing argument and may comment on the evidence and any reasonable inference from that evidence. *People v. Land*, 2011 IL App (1st) 101048, ¶

_____

[2]  See 720 ILCS 5/7-1 *et seq.* (West 2012) (justifiable use of force).

154. Nonetheless, a prosecutor may not misstate the law or attempt to shift the burden of proof to the defense. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶¶ 31, 34.

¶ 45 Defendant maintains that throughout her closing and rebuttal argument, the prosecutor misstated the law as to self-defense and the mitigating factor required to reduce first degree murder to second degree murder. As a result, defendant contends the jury was misled or at least confused as to which party bore the burden of proving self-defense and the mitigating factor. Defendant argues that either individually or when considered cumulatively these remarks denied him a fair trial. The complained-of remarks are set forth below. Where necessary, the complained-of remarks are italicized in the portions of the argument in which they appear.

¶ 46 While explaining the use of circumstantial evidence, the prosecutor told the jury:

> "In this case we have somebody who was trying to claim they were justified in what they did the day that they murdered Brandon. *This defendant has got to prove that he was justified in his use of force that day,* and I want you to remember that you can use circumstantial evidence from the testimony, from the physical evidence and from what you can infer to determine *whether or not you believe his justification was reasonable and whether you believe that he's proved that he was justified that day*, so circumstantial evidence is very important in this case, and keep it in the back of your mind while you are in the back deliberating."

¶ 47 The remark was a clear misstatement of the law by the prosecutor. Where a defendant raises self-defense, he does not have to prove that he was justified in his use of force. When self-defense is appropriately raised, it is the State's burden to prove beyond a reasonable double "the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code." 720 ILCS 5/9-2(c) (West 2012).

¶ 48 Next, in discussing defendant's testimony, the prosecutor maintained:

"He tried to put himself in the best light when he got up there, any little way he could try to tweak something to make it look like there was some sort of self defense [*sic*] in this case, where there's not, any way he could try to make it look like he was justified in shooting Brandon, not once, not twice but that third shot in his back on the ground when he's not even moving.

\* \* \*

That last shot he puts in Brandon's back. How you can explain shooting somebody that's lying on the ground in their back is justified - - how you can ever explain shooting somebody in their back is justified is unconscionable."

¶ 51    Defendant maintains that the prosecutor's remark was another instance of telling the jury defendant had to prove he was justified in shooting Brandon. We disagree. The prosecutor was commenting on the evidence defendant presented on his claim of self-defense. It is not error for the prosecutor to comment on the defendant's evidence. *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 61.

¶ 52    Next, the prosecutor told the jury it would receive instructions on first degree murder and the defendant's justification and "there's going to be a couple of instructions that deal with that, because it's a little more complicated, so I will read a couple of them to you and go through them with you." The prosecutor continued as follows:

"One of the instructions is going to read like this: A mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if at the time of the killing the defendant believes that circumstances exist which would justify the deadly force he uses.

But his belief that such circumstances exist is unreasonable. *The key words in this instruction, ladies and gentlemen, are at the time of the killing that he was justified in the*

12

*deadly force."*

¶ 53 The State responds that the prosecutor correctly set forth the instruction and then chose to highlight a particular portion of it to the jury. It argues that the prosecutor's remark was designed to emphasize to the jury that the danger the defendant perceived must be imminent in nature, as demonstrated by the argument that followed in which she explained to the jury that what had happened prior to the day of the shooting was not relevant because the instruction specifically stated "it has to be at the time of the killing."

¶ 54 We disagree with the State. The prosecutor was discussing justification in terms of the second degree murder mitigating factor of an unreasonable belief that deadly force was necessary but then chose to emphasize the justification element in terms of self-defense as a defense for first degree murder. The emphasis on "justification" without the qualifier of "unreasonable belief" at the very least implied to the jury, incorrectly, that defendant needed to prove he was justified rather than having an unreasonable belief that he was justified to be found guilty of second degree murder.

¶ 55 Next, the prosecutor told the jury:

"Another instruction that you will get regarding justification in this case - - or alleged justification in this case, is that a person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force."

¶ 56 Defendant argues that the prosecutor misled the jury by suggesting there were different instructions all pertaining to the same issue of the justified use of force. He maintains that in addressing "justification," the prosecutor continued to combine the "reasonable belief" necessary for self-defense with the mitigation factor's "unreasonable belief" necessary for second degree murder.

¶ 57    The prosecutor's remark reminded the jury that the "[i]imminent use of force is force at the time" and that to be justified, it had to be a reasonable belief. She pointed out no one at the scene saw a gun in Brandon's possession; even defendant said he never saw Brandon have a gun that day. There was no misstatement of the law or improper shifting of the burden of proof by the prosecutor's remark.

¶ 58  Next, defendant maintains that the prosecutor continued to misstate the law in her argument. The prosecutor reviewed for the jury the elements the State was required to prove to convict defendant of first degree murder. The prosecutor then explained that the State was required to prove beyond a reasonable doubt that defendant was not justified in using the force  he did. Only then could the jury could find defendant guilty of first degree murder. In discussing second degree murder, the prosecutor told the jury that the defendant had the burden of proving by a preponderance of the evidence that a mitigating factor was present, explaining as follows:

> "That's what preponderance of the evidence is, more probably true than not true that the following mitigating factor is present: That the defendant at the time he performed the act - - so at the time he was shooting Brandon, all three shots, caused the death of Brandon Wilborn, he believed that the circumstances to be such that justify the deadly force he used, but his belief that such circumstances existed was unreasonable.
>
> *So the defense has to prove in this case that by a preponderance of the evidence he was justified."*

¶ 59    Telling the jury defendant was required to prove that he was justified in shooting Brandon in order for the jury to find him guilty of second degree murder was a misstatement of the burden of proof. The State concedes that the last sentence of the prosecutor's quoted remark suggested that defendant had to prove by a preponderance of the evidence that he was justified when he shot Brandon. The State maintains that any misstatement by the prosecutor was

14

immediately corrected when she continued her argument as follows:

> "If you find from your consideration of all the evidence that the defendant has proved by a preponderance of the evidence that a mitigating factor is present, so that he is guilty of a lesser offense of second degree murder instead of first degree murder, you should find defendant guilty of second degree murder."

¶ 60 We disagree. Our supreme court pointed out in *People v. Keene*, 169 Ill. 2d 1 (1995), "[t]he degree of inaccuracy of the commentary [citation] as well as the number of times the jury is made to hear it [citation] are, however, relevant" in determining the harm done to a defendant by the remark. *Keene*, 169 Ill. 2d at 25. Since this was not the first instance in her argument that the prosecutor misstated the burden of proof, we find the remark improper. See *Keene*, 169 Ill. 2d at 25 (doubt as to the extent of harm is resolved in favor of the defendant).

¶ 61 Next, defendant maintains that the prosecutor confused the jury as to defendant's burden of proof and added an element to the determination of mitigation. The prosecutor told the jury that because defendant was the initial aggressor, it would receive Illinois Pattern Jury Instructions, Criminal, No. 24-25.09 (4th ed. 2000) (hereinafter IPI Criminal 4th). She explained that the instruction provided that an individual "who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes that he is in imminent danger of death or great bodily harm." The prosecutor stated further as follows:

> "But there's a second part to [the instruction] when you are the initial aggressor, when you are the guy who starts the fight, and it reads like this: And he has exhausted every reasonable means to escape the danger, other than the use of force, which is likely to cause death or great bodily harm to the other person, Every [*sic*] reasonable means to escape the danger.

15

He didn't do anything to escape the danger, and he has to do that in this case to be found guilty of second degree, every — has exhausted every reasonable means to escape the danger."

The State concedes that the prosecutor misstated the law when she told the jury to consider IPI Criminal 4th No. 24-25.09, since that instruction does not apply to second degree murder. Since it misstated the law, the prosecutor's remark was improper.

¶ 62    Finally, defendant maintains that in her rebuttal argument, the prosecutor continued to tell the jury that in establishing either self-defense or the existence of the mitigating factor, defendant was required to prove the justified use of force beyond a preponderance of the evidence. Reminding the jury that defendant was presumed innocent but not honest, the prosecutor continued as follows:

"We have a burden. It's a good and decent burden, and there is overwhelming evidence in this case. We have met that burden. Have they met their burden? Not even close. They haven't reached a preponderance of evidence, not at all. His actions were not reasonable or unreasonable. There was no justification. Brandon Wilborn with [*sic*] unarmed when he came back, and we have to focus on that time period. It's not about September 30th. it's [*sic*] not about October 1st."

¶ 63    The prosecutor prefaced her argument by pointing to the evidence that defendant had  made the choices to: steal the cell phone, refuse to shake Brandon's hand, "sucker punch" Brandon and then to engage in a fist fight with him, arm himself, approach Brandon and then fire the gun into Brandon five times, even though the gun misfired twice before the final shot. The prosecutor's argument directed the jury to focus on the evidence supporting first degree murder and on the absence of any evidence to support defendant's claim of justification. We find no misstatement of the law or an improper shifting of the burden of proof in the prosecutor's  rebuttal argument.

16

¶ 64 Our review of the prosecutor's argument revealed multiple instances where the prosecutor's arguments misstated the burden of proof by telling the jury that defendant had to prove justification regardless of whether she was addressing his self-defense claim or the presence of the mitigating factor for the jury to find him guilty of second degree murder. At the very least, the prosecutor created confusion as to the respective burdens of proof and by explaining an instruction that was not applicable to the argument she was making to the jury. We conclude that clear and obvious error occurred in the prosecutor's closing argument.

¶ 65                    C. Two Prongs of the Plain Error Doctrine

¶ 66    Our next step is to examine the evidence to determine if it was closely balanced so that the error resulting from the improper remarks alone threatened to tip the scales of justice or if the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process regardless of the closeness of the evidence. *Clark*, 2016 IL 118845, ¶ 42.

¶ 67                              1. *Closely Balanced*

¶ 68   " 'Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge.' " *Sebby*, 2017 IL 119445, ¶ 60 (quoting *Piatkowski*, 225 Ill. 2d at 566). "In determining whether the evidence at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. "A reviewing court's inquiry involves an assessment of the evidence of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 69    In order to find defendant guilty of first degree murder, the jury had to determine that the State had proved beyond a reasonable doubt that defendant committed the acts that resulted in Brandon's death. Since defendant admitted firing the shots that killed Brandon, the issue is

17

whether the shooting was justified, *i.e.*, he reasonably believed that shooting Brandon was necessary. In order to find defendant guilty of second degree murder, the jury must first have determined beyond a reasonable doubt that defendant was guilty of first degree murder, but then determined that defendant had proved by a preponderance of the evidence that a mitigating factor was present, *i.e.,* he believed he was justified in shooting Brandon, but his belief was unreasonable. Therefore, our focus is on the evidence relating to justification.

¶ 70 Defendant maintains that the evidence was closely balanced where: prior to the fatal shooting, Brandon threatened defendant with a gun; following their fist fight in Aaron's yard, Brandon announced he was going to get a gun; defendant knew that Brandon had an unpredictable and wild nature; defendant saw Brandon rummage through the trunk of the Oldsmobile before driving off and that when he returned, defendant saw the outline of a gun in Brandon's pocket; and defendant saw Brandon quickly pull his hand from the pocket where defendant had seen the outline of the gun. See *People v. Young*, 347 Ill. App. 3d 909, 930 (2004) (Theis, J., specially concurring) (finding the evidence was closely balanced where the physical evidence was inconclusive, and the defendant's self-defense claim was supported by the medical evidence and the testimony of his witnesses, making the credibility issue significant).

¶ 71    In addition to *Young,* defendant relies on *Carbajal* and *People v. Gutierrez*, 239 Ill. App. 3d 536 (1992). In *Carbajal*, the reviewing court found the evidence on the issue of the defendant's intent to enter the school building to commit a burglary closely balanced where: the defendant testified denying that his companion told him prior to entering the school that he wanted to look for money in the school, and the defendant's written statement was ambiguous on when the intent to look for money was first expressed. *Carbajal*, 2013 IL App (2d), 111018, ¶ 44. In *Gutierrez*, the court found the evidence closely balanced on the affirmative defense of voluntary intoxication where the testimony of both the State's and the defendant's witnesses provided some evidence in

support of the defense. *Gutierrez*, 239 Ill. App. 3d at 544.

¶ 72    In contrast to the evidence presented in *Carbajal*, *Young*, and *Gutierrez*, here defendant's testimony that he acted in self-defense in shooting Brandon was contradicted by the State's witnesses Aaron, Keenan and Cortez, all of whom were all present at the scene at the time of the shooting. In particular, these witnesses contradicted defendant's testimony as to Brandon's attempts to reach for defendant's gun, actions defendant claimed required him to shoot Brandon three times. None of those movements were observed by the eyewitnesses. While Aaron heard Brandon say he was going to get a gun before getting into the Oldsmobile, there was no testimony that Brandon was carrying a weapon on the day of the shooting, and no one corroborated defendant's testimony that Brandon rummaged around in the trunk of the Oldsmobile before driving off.

¶ 73    For his part, defendant admitted lying to police when he denied that he had been at  Aaron's house or that he had an altercation with Brandon. He admitted trying to blame Aaron for shooting Brandon. Defendant's testimony in which he denied telling Detective Growe that he  had refused to shake hands with Brandon and insisted that he told him that he saw the outline of  a gun in Brandon's pocket, was impeached by the videotape of his interview with the detective.

¶ 74    Moreover, defendant's witnesses did not corroborate his testimony that he shot Brandon  in self-defense or because he had an unreasonable belief that he was justified in shooting Brandon. Defendant's witnesses consisted of his father, who was not present when defendant shot Brandon, and Aaron, who witnessed the shooting. Mr. Wilburn testified that Brandon had come looking for defendant. He did not testify that Brandon was armed or made threats against defendant. Aaron's testimony for defendant was limited to an occasion in 2011, some 2 years prior to the shooting when Brandon and defendant had a physical confrontation. Aaron added  that it was the only physical fight prior to the shooting of which he was aware.

¶ 75   Where there are two opposing but credible versions of the events and neither is corroborated or contradicted by extrinsic evidence, the evidence is closely balanced. *Sebby*, 2017 IL 119445, ¶ 63; see *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008) (evidence closely balanced where the defendant's testimony was credible in that it was consistent with much of the police officers' testimony and the circumstances of his arrest); compare *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (evidence was not closely balanced where the defendant's testimony "strained credulity" and in part corroborated that of the complaining witness).

¶ 76   Unlike *Carbajal* and *Young*, there was no credibility contest in the present case. Defendant's version of the shooting was contradicted by his own testimony, as well as that of the State's witnesses. His own witnesses failed to support his claim that he was so afraid of Brandon that he was justified or believed he was justified in shooting him.  Defendant admitted lying to police and then trying to place the blame for Brandon's death on Aaron, his friend. According to defendant, about a year and half prior to the shooting, Brandon and he had a physical fight. Yet fear of Brandon did not stop defendant from taking a cell phone from Andrell, a friend of Brandon's, when Brandon was present, and running off with it. While Brandon possessed a gun when he confronted defendant about the cell phone theft, Brandon did not point the gun at defendant or threaten to shoot him. Brandon returned the gun to Cortez's car when defendant asked him to put the gun away. Finally, as Cortez related, a few days prior to the shooting, defendant was at Brandon's house with Brandon and a group of people, just drinking and talking. In light of these facts, defendant's claim that he had to shoot Brandon in self-defense or because he believed unreasonably that he had to shoot him, strains credulity.

¶ 77   The evidence as to whether the shooting was justified or whether defendant had an unreasonable belief that it was justified was not closely balanced. Therefore, the error does not rise to the level of plain error under the first prong of the plain error analysis.

¶ 78                                  2. *Serious Error*

¶ 79    Defendant argues that the prosecutor's misstatements of the law and attempts to shift the burden of proof were such serious errors that he was denied a fair trial.

¶ 80    A misstatement of law during closing argument can be grounds for reversal. *People v. Jonathan Jackson*, 2012 IL App (1st) 092833, ¶ 36. However, where the trial court properly instructs the jury on the law, a prosecutor's misstatement of the law during closing arguments does not normally constitute reversible error, since the closing arguments are construed to carry less weight with the jury than do the instructions from the trial court. *Jonathan Jackson*, 2012 IL App (1st) 092833, ¶ 36. We find the reviewing court's plain error analysis in *Jonathan Jackson* instructive.

¶ 81    In *Jonathan Jackson*, the defendant appealed his conviction for predatory criminal sexual assault. While he acknowledged that he failed to preserve the claimed-errors in the prosecutor's closing argument for appeal, he sought plain error review. The reviewing court first determined that the evidence was not closely balanced for the claimed errors to have tipped the scales of justice against him. The court then considered the defendant's arguments as they pertained to the second prong of plain error review. *Jonathan Jackson*, 2012 IL App (1st) 092833, ¶ 35.

¶ 82    The reviewing court in *Jonathan Jackson* acknowledged that in closing argument, the prosecutor twice defined "penetration" incorrectly, equating it with the word "contact." The court noted that the State initially had read the correct definition of penetration to the jury, and the trial court properly instructed the jury on the correct definition of penetration. Both before and after closing arguments, the trial court advised the jury that attorneys' statements were not evidence. Moreover, the court advised the jury that the law that applied to the case was contained in the court's instructions and that the jury must follow those instructions. *Jonathan Jackson*, 2012 IL App (1st) 092833, ¶ 38. The reviewing court concluded as follows:

"Because the trial court correctly instructed the jury on the correct definition of 'penetration,' we cannot say that the State's improper comments during closing argument were so serious that they affected the fairness of Jackson's trial. Therefore, we hold that the State's comments regarding penetration and contact, though erroneous, do not amount to plain error." *Jonathan Jackson*, 2012 IL App (1st) 092833, ¶ 38.

¶ 83   Prior to closing arguments in the present case, the trial court told the jury, "[w]hat the lawyers say during closing arguments is not evidence and should not be considered by you as evidence." Following closing arguments, the trial court instructed the jury, *inter alia*, as follows:

"The law that applies to this case is stated in these instructions, and it is your duty to follow all of them. You must not single out certain instructions and disregard others.

* * *

"Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based upon the evidence should be disregarded."

¶ 84   Just as in *Jonathan Jackson*, in the present case, the jury was instructed to apply the law as stated in the instructions and that the arguments of the attorneys were confined to the facts and the reasonable inferences from the evidence. Since the jury was required to follow the law as set forth in the instructions, not the arguments of the attorneys, we hold that the prosecutor's misstatements of the law were improper but not so serious that they affected the fairness of the defendant's trial. Therefore, the improper remarks did not amount to plain error under the second prong of the plain-error analysis. See *Jonathan Jackson*, 2012 IL App (1st) 092833, ¶ 38.

¶ 85                                          D. No Plain Error

22

¶ 86    "[W]hile all plain errors are reversible ones, not all reversible errors are also 'plain' for purposes of Rule 615(a)." *Keene*, 169 Ill. 2d at 17. "[I]f, in the end, the error is found not to rise to the level of a plain error as contemplated by Rule 615(a), the procedural default must be honored." *Keene*, 169 Ill. 2d at 17. We conclude that neither the closely-balanced-evidence  prong nor the serious-error prong of the plain error analysis has been established by defendant. Since the error did not rise to the level of plain error as contemplated by Rule 615(a), we must honor the procedural default. *Keene*, 169 Ill. 2d at 17.

¶ 87                                II. Ineffective Assistance of Counsel

¶ 88    In the alternative, the defendant claims his trial attorney was ineffective for failing to object to the prosecutor's argument. We apply the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to determine whether the defendant was denied his right to the effective assistance of counsel. *Land*, 2011 IL App (1st) 101048, ¶ 114. The *Strickland* two-pronged test requires the defendant to show that (1) counsel's performance was objectively unreasonable under prevailing professional norms, and (2) there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Land*, 2011 IL App (1st) 101048, ¶ 115. If the reviewing court finds that the defendant was not prejudiced, it may dismiss the claim on that basis alone without further analysis.  *Land*, 2011 IL App (1st) 101048, ¶ 116.

¶ 89    As we determined, the evidence was not closely balanced on the issue of justification.  Thus there was not a reasonable probability that the result of the proceeding would have been different. Since defendant failed to show he was prejudiced, his claim of ineffective assistance of counsel fails. See *Land*, 2011 IL App (1st) 101048, ¶ 117.

¶ 90                                        II. Sentencing

¶ 91      Defendant contends that his 53-year sentence: (1) is a *de* facto life sentence and violates

the eighth amendment of the United States Constitution (U.S. Const., amend. VIII), (2) violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11) and (3) is excessive.

¶ 92    On September 10, 2015, following the denial of defendant's motion for a new trial and the sentencing hearing, the trial court sentenced him to 53 years' imprisonment. The trial court inquired of defendant's trial counsel if he would be filing a motion to reconsider sentence at that time. Counsel responded that he would file it within 30 days. According to the record on appeal, the notice of appeal was filed on October 13, 2015, but a search of the record on appeal revealed no motion to reconsider sentence.[3]

¶ 93 Generally, to preserve a claim of sentencing error, a defendant must make a contemporaneous objection and raise the error in a written postsentencing motion. *People v. Brown*, 2017 IL App (1st) 142877, ¶ 70. Defendant did not object at the time he was sentenced and did not file a motion to reconsider his sentence. Nonetheless, the rules of waiver and forfeiture also apply to the State. *Brown*, 2017 IL App (1st) 142877, ¶ 70. The State failed to raise the forfeiture issue, and so we will address the merits of defendant's sentencing claims.

¶ 94                            A. *De Facto* Life Sentence

¶ 95    Defendant contends that his 53-year sentence violates the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) in that it amounts to a *de facto* life sentence.

¶ 96    During the pendency of this appeal, our supreme court decided *People v. Harris*, 2018 IL 121932. Rejecting the 18-year-old defendant's eighth amendment challenge, the supreme court in *Harris* held that "for sentencing purposes, the age of 18 marked the present line between juveniles and adults. As an 18-year-old, defendant falls on the adult side of that line. Accordingly,

---

[3]  The only order listed in the notice of appeal was the September 10, 2015, sentencing order. Neither party referred to such a motion in their respective briefs, nor is the motion listed in the index to the record on appeal.

defendant's facial challenge to his aggregate sentence under the eighth amendment necessarily fails." *Harris*, 2018 IL 121932, ¶ 61.

¶ 97   As in *Harris,* in the present case, defendant's challenge to his sentence under the eighth amendment is a facial one, *i.e.* he does not rely on his particular circumstances but argues that the eighth amendment protection afforded to juveniles, recognized by the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012), should be extended to all 18-year-olds.  Since defendant in the present case was 18 years old at the time he shot Brandon, in accordance with *Harris*, his challenge to his 53-year sentence under the eighth amendment fails.

¶ 98                                    B. Proportionate Penalties

¶ 99 Defendant contends that, as applied to him, his 53-year sentence violates the proportionate penalties clause of the Illinois Constitution. A proportionality challenge derives from article I, section 11 of the Illinois Constitution of 1970. *People v. Williams*, 2015 IL 117470, ¶ 9.

¶ 100   Section 11, which is commonly referred to as the proportionate penalties clause, provides that " '[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *Williams*, 2015 IL 117470, ¶ 9 (quoting Ill. Const. 1970, art. I, § 11). A proportionate penalties challenge can be raised on the basis that the penalty for a particular offense is too severe under the cruel or degrading standard or that the penalty is harsher than the penalty for a different offense that contains identical elements. *Williams*, 2015 IL 117470, ¶ 9.

¶ 101   Defendant contends that, as applied to him, the 53-year sentence is too severe under the cruel and degrading standard because it affords him no opportunity for rehabilitation. "[A]n as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party." *Harris*, 2018 IL 121932, ¶ 38.

¶ 102   Like defendant in the present case, the defendant in *Harris* failed to raise either of his

sentencing claims in the trial court. But he maintained that the record was sufficient to consider his claim that his mandatory 76-year sentence violated the proportionate penalties clause. *Harris*, 2018 IL 121932, ¶ 36. The supreme court found the record insufficient to address the defendant's proportionate penalties clause challenge, explaining that "[a]ll as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." (Internal quotation marks omitted.) *Harris*, 2018 IL 121932, ¶ 39 (quoting *People ex rel. Hartich v. 2010 Harley- Davidson*, 2018 IL 121636, ¶ 31, quoting *People v. Thompson*, 2015 IL 118151, ¶ 37). The court in *Harris* determined that "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Harris*, 2018 IL 121932, ¶ 41.

¶ 103   Because the defendant in *Harris* failed to raise his as-applied constitutional challenge in the trial court, the record did not contain any evidence on how the evolving science on juvenile maturity and brain development that helped develop the basis for the Supreme Court's decision in *Miller* applied to him as an adult. Therefore, the court determined that the defendant's as- applied challenge was premature. *Harris*, 2018 IL 121932, ¶ 46.

¶ 104   The supreme court in *Harris* declined the defendant's request for remand to the trial court for an evidentiary hearing. Instead, the court determined that the defendant's claim was more appropriately raised in another proceeding such as a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2016)) or a petition under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2016)). *Harris*, 2018 IL 121932, ¶ 48. The court pointed out that the Act was designed to resolve constitutional issues, particularly those which depended upon facts not found in the record. *Harris*, 2018 IL

121932, ¶ 48; see *People v. Vega*, 2018 IL App (1st), 160619 ¶¶ 57-58 (citing *Harris*, this court held in the absence of an evidentiary hearing, the defendant's proportionate penalties and eighth amendment challenges, both of which were as-applied, were premature and more appropriately raised in a postconviction petition).

¶ 105 Like the defendant in *Harris*, in the present case, defendant failed to raise his proportionate penalties challenge to his sentence in the trial court. No evidentiary hearing was held, and no findings of facts were made by the trial court. In accordance with *Harris* and *Vega*, we conclude that defendant's proportionate penalties claim would be more appropriately raised in proceedings under the Act or under section 2-1401 of the Code.

¶ 106 The recent decision of this court in *People v. House*, 2019 IL App (1st) 110580-B, does not require a different result. In that case, the appeal was from the dismissal of the defendant's postconviction petition. Unlike the defendant in *Harris* and defendant in the present case, in *House*, the defendant had consistently challenged his mandatory natural life sentence by a motion to reconsider sentence in the trial court, on direct appeal and in postconviction proceedings, the forum suggested by the supreme court in *Harris*. Therefore his claim was not premature. *House*, 2019 IL App (1st) 110580-B, ¶ 32.

¶ 107 The present case resembles *Harris* rather than *House*, in that defendant here raised his proportionate penalties claim for the first time on direct appeal. Therefore, the appropriate forum for defendant to bring his proportionate penalties claim is under the Act or section 2-1401 of the Code.

¶ 108                                    C. Excessive Sentence

¶ 109 Defendant was found guilty of first degree murder and aggravated unlawful use of a weapon. The trial court imposed consecutive sentences of 25 years for first degree murder, five years higher than the minimum, 3 years for aggravated unlawful use of a weapon, the maximum sentence, and

25 years for personally discharging the firearm causing Brandon's death, the minimum sentence, for a total of 53 years' imprisonment.[4]

¶ 110   Defendant contends that his 53-year sentence is excessive. He maintains that the State's only evidence in aggravation was the victim impact statement by Brandon's mother.[5] Defendant argues that the trial court concentrated more on the circumstances of the offense and did not give proper weight to the factors in mitigation. He insists he shot Brandon because he believed that he needed to defend himself, notwithstanding the fact that the jury rejected his self-defense argument. He points out that at age 18 he was more prone to impulsive behaviors and more susceptible to the influence of his peers. The fact that he had strong family support also argued against a sentence higher than the minimum sentence.

¶ 111 Defendant argues that shooting Brandon was a highly aberrant act in light of his background and unlikely to occur again, a factor which the trial court must consider in determining the appropriate sentence. See 730 ILCS 5/5-5-3.1(a)(8) (West 2012) (the criminal conduct was the result of circumstances unlikely to reoccur). Defendant concludes that this court should exercise its powers under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1963) to reduce his sentence to 48 years, the aggregate statutory minimum.

¶ 112   A reviewing court will not disturb the trial court's sentencing decision absent an abuse of discretion. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 134.  Where, as here, the defendant's sentence falls within the prescribed statutory limits, the reviewing court will not find an abuse of

---

[4] The sentencing range for first degree murder was between 20 and 60 years (730 ILCS 5/5-4.5- 20(a) (West 2012)), and the sentencing range for aggravated unlawful use of a weapon and applicable in this case was 3 to 7 years (720 ILCS 5/24-1.6(d)(1) (West 2012)). Because defendant personally discharged a firearm resulting in Brandon's death, the trial court was required to add to his sentence for first degree murder a mandatory enhancement ranging from 25 years to a term of natural life imprisonment (730 ILCS 5/5-8-1(d)(iii) (West 2012)).

[5] Defendant must be referring to his lack of adult criminal convictions. His juvenile record included a robbery a year prior to the charges in this case which was referred to in the presentencing report and at the sentencing hearing.

that discretion unless the sentence is greatly at variance with the purpose and spirit of the law or is manifestly disproportionate to the offense. *People v. Means*, 2017 IL App (1st) 142613, ¶ 14.

¶ 113   "A sentence must reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship." *Vega*, 2018 IL App (1st) 160619, ¶ 68. "The seriousness of the offense, and not mitigating evidence, is the most important sentencing factor." *Vega*, 2018 IL App (1st) 160619, ¶ 68. Here, the evidence established that defendant shot Brandon twice at close range and then fired a third shot into him while standing over him. Defendant's assertion that he acted in self-defense because Brandon was trying to reach for defendant's gun or access his own was rejected by the jury. The jury concluded that defendant acted without justification in shooting Brandon. The circumstances of the shooting in this case justified the trial court's emphasis on the seriousness of the offense over the evidence in mitigation. *Vega*, 2018 IL App (1st) 160619, ¶ 68.

¶ 114   In mitigation, the trial court noted that defendant had been raised in a loving family with two parents, who continued to support him by appearing at his trial. The court rejected the prosecutor's attempt to portray defendant as leading a "some sort of thug life." However, the court then decried the fact that defendant, who had everything going for him, chose to steal a cell phone, which culminated into the confrontation with Brandon and resulted in Brandon's death. In the court's words, "I think this was somebody who had - - was raised to know better and did something he wasn't supposed to do, and the jury disregarded your defense of self-defense."

¶ 115 The trial court's comments regarding defendant's choices and that he was raised to "know better" did not include a specific consideration of defendant's age. Defendant turned 18 years old less than a month before the shooting. Though technically not a juvenile, defendant's "choices" may be considered to be reflective of his youth and immaturity. While age is only one of the factors in mitigation to be considered, here there is no indication that the trial court considered that defendant made those choices it decried due to his age. We vacate defendant's

sentence and remand the matter to the trial court for resentencing.

¶ 116                                    CONCLUSION

¶ 117   In sum, we honored the procedural default where defendant failed to preserve the errors he alleged occurred in closing argument and did not satisfy either prong of the plain error analysis. Defendant failed to establish ineffective assistance of counsel where defendant suffered no prejudice resulting from counsel's failure to object to the prosecutor's remarks in closing argument. We rejected defendant's eighth amendment claim. In the absence of an evidentiary hearing and findings of fact, we found defendant's proportionate penalties violation claim premature and determined it should be raised in a postconviction or section 2-1401 proceeding. Finally, we vacate defendant's sentence and remand the matter to the trial court for resentencing.

¶ 118   For all the foregoing reasons, the defendant's convictions are affirmed, his sentence is vacated, and the cause is remanded for resentencing.

¶ 119   Affirmed in part, vacated in part. Cause remanded.