2024 IL App (1st) 231314-U

THIRD DIVISION
December 18, 2024

No. 1-23-1314

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 13 CR 21485 |
| | ) | |
| NOAH N. WILBURN, | ) | |
| | ) | Honorable Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Justice Martin concurred in the judgment.
Justice Reyes specially concurred.

**ORDER**

¶ 1    *Held:*    The trial court did not err in rejecting defendant's request to raise a proportionate penalties claim at the resentencing hearing on remand. The statute prohibiting the possession of a weapon by an individual with a prior juvenile adjudication is not unconstitutional either facially or as applied to defendant. Affirmed.

¶ 2    Following a jury trial, defendant Noah N. Wilburn was found guilty of first degree murder and aggravated unlawful use of a weapon in connection with the death of Brandon Wilborn.[1] The trial court sentenced defendant to consecutive sentences of 50 years' imprisonment for first degree murder and 3 years' imprisonment for aggravated unlawful use of a weapon. On direct appeal, we vacated his sentence and remanded for resentencing. *People v. Wilburn*, 2019 IL App (1st) 153196-U, ¶ 1 (*Wilburn I*).[2] On remand, the court reimposed the same sentences. Defendant again appeals, contending that (1) the court erred in rejecting his request to raise a proportionate penalties claim at the resentencing hearing on remand and (2) the statute prohibiting the possession of a weapon by an individual with a prior juvenile adjudication is unconstitutional both facially and as applied to him. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                    BACKGROUND

¶ 4    This court has detailed the underlying facts of this case in *Wilburn I*. See *Wilburn*, 2019 IL App (1st) 153196-U, ¶¶ 4-28. Therefore, we will summarize only those facts pertinent to the particular issues now before us.

¶ 5                              Trial and Direct Appeal

¶ 6    In a multi-count indictment, the State charged defendant with, *inter alia*, first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) (counts I through VIII) and aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), 24-1.6(a)(3)(D) (West 2012)) in connection with

---

[1]  Due to the similarity in spelling between defendant's and the victim's last names, we refer to the victim as "Brandon," the same spelling the victim's mother used in her victim impact statement. We note, nonetheless, that the victim's first name is also spelled "Branden."

[2]  The public-domain case designator of defendant's direct appeal is listed as "2019 IL App (1st) 153196," which is erroneous. Defendant's direct appeal was disposed of pursuant to Illinois Supreme Court Rule 23(b) (Ill. S. Ct. R. 23(b) (eff. Apr. 1, 2018). As such, it requires the characters "-U" at the end and should therefore read as "2019 IL App (1st) 153196-U." See *id.*; M.R. No. 10343 (Nov. 21, 2017). This court subsequently corrected this error.

the shooting death of Brandon Wilborn. Count IV alleged in essence that defendant "intentionally" committed first degree murder of Brandon while armed with a firearm and personally discharged the firearm, which proximately caused Brandon's death. Count VIII mirrored the allegations of count IV but alleged that defendant committed the act "knowing that it created a strong probability of death or great bodily harm" to Brandon. Count XI alleged in substance that defendant committed the offense of AUUW for carrying on or about his person a firearm after having been previously adjudicated a delinquent minor for robbery.[3]

¶ 7    The following evidence was adduced at trial. On September 30, 2013, defendant (who turned 18 years old on September 14, 2013), Andrell Bell, Aaron Campbell, and Brandon were outside Campbell's house. Defendant had taken Bell's cell phone from her car, and Brandon chased after defendant trying to recover the phone. Defendant admitted that he sold the phone for $150. Defendant got away from Brandon by quickly getting into Campbell's car as Campbell was leaving. When Campbell turned a corner, he dropped defendant off.

¶ 8    The next day (October 1, 2013), Brandon, Bell, and Cortez Wingo (Bell's boyfriend) confronted defendant at defendant's parents' home, hoping to get Bell's cell phone returned to her. Brandon was holding Wingo's .40-caliber semiautomatic gun in his hand. During the confrontation, the gun was always in plain sight, but Brandon never pointed the gun at defendant. Brandon told defendant to return Bell's phone " 'or else.' "

¶ 9    At around 4:30 p.m. on October 11, 2013, defendant was dropped off at Campbell's house. Defendant gave Campbell a .38-caliber handgun and asked Campbell to hold onto it. Campbell put the gun in his waistband. Brandon, who was unarmed, arrived shortly thereafter and

---

[3] The State subsequently nol-prossed the remaining counts, counts II, III, V, VI, VII, IX, X, XII, XIII, XIV, XV, and XVI.

approached defendant. Brandon tried to shake defendant's hand, but defendant "smacked" Brandon's hand away. As Brandon turned away from defendant to speak to someone, defendant punched Brandon in the back of the head. Defendant and Brandon then fought for about six or seven minutes. Afterwards, Brandon again tried to shake defendant's hand, but defendant refused, and they began to argue.

¶ 10    Wingo testified that defendant started asking people for a gun, whereas Campbell and Campbell's friend (Keenan Hollingsworth) testified that Brandon was going to either get a gun or get "something to shut [defendant] up." Brandon then drove off but not in the direction of where he lived. Defendant then asked Campbell for his gun, but Campbell initially refused until Brandon returned, which was less than a minute after Brandon had left. Defendant then placed the gun in his waistband.

¶ 11    When Brandon returned, he walked up the driveway and leaned against a car that was already parked there. Brandon was again unarmed. Defendant walked up to Brandon while holding onto the gun that was in defendant's waistband until he and Brandon were face to face. Wingo surmised that Brandon saw defendant holding the gun and tried to grab defendant's arm. Defendant then grabbed Brandon's arm and fired one shot, striking Brandon in the groin area. Brandon appeared "shocked" and let go of defendant's arm.

¶ 12    Defendant then shot Brandon a second time in the "stomach." Brandon fell to the ground, and defendant, while standing over Brandon, shot a third time into Brandon's back. At the time of the third shot, Brandon was not reaching for, "fighting back," or otherwise resisting defendant. One witness testified that, immediately after shooting Brandon a third time, defendant "looked up[,] licked his lips[, and] had a grin on his face." Defendant then put the gun back into his waistband and ran to the wooded area behind Campbell's house. Police subsequently recovered a

4

.38-special caliber revolver from the wooded area east of Campbell's house. After the shooting, Campbell and Wingo placed Brandon into the backseat of Wingo's car, and Wingo then drove Brandon to the hospital, where he was pronounced dead.

¶ 13    Subsequent testimony established that the two bullets recovered from Brandon and the three fired cartridge cases were from the .38-caliber revolver the police recovered in the wooded area near Campbell's house. An autopsy revealed that Brandon sustained three gunshot wounds: a contact wound, a close-up wound, and a long-distance wound. Brandon's manner of death was homicide, and the cause of death was the long-distance gunshot wound to his left shoulder and the close-up gunshot wound to his left chest.

¶ 14    Defendant testified on his own behalf, stating that he shot Brandon in self-defense. Defendant admitted that, days before the shooting, he had stolen Bell's cell phone and sold it for around $150 because his mother had stopped giving him money. Defendant recounted that, the next day, Brandon, Bell, and Wingo went to defendant's residence and demanded Bell's phone. When defendant told Brandon the phone was "gone," Brandon brandished a gun and warned defendant that, the next time Brandon saw defendant, defendant would have to either return the phone or give them money for a new phone.

¶ 15    On the day of the shooting, defendant said that, after Brandon returned to Campbell's house, defendant believed Brandon was going to kill him and saw a bulge in the pocket of Brandon's pants. Defendant said that he pointed the gun to the right but looked to his left when he fired the first time. According to defendant, Brandon then "lunged" for defendant, so defendant "snatched back" his arm, at which point the gun fired for a second time.

¶ 16    Following deliberations, the jury found defendant guilty of first degree murder and AUUW. The trial court then ordered the preparation of a presentence investigation report (PSI)

and continued the matter for sentencing. At defendant's sentencing hearing, the trial court stated that it "read through" the PSI, which indicated that defendant was born on September 14, 1995, and that the offense took place on October 11, 2013. The court further noted that defendant's family had been in court "the whole time." The court added, "And when I read the pre-sentence investigation [report], I read he has always been raised by both his parents."

¶ 17    At the conclusion of the sentencing hearing, the trial court merged the first degree murder conviction under count VIII into the first degree murder conviction under count IV. The court then sentenced defendant to consecutive terms of 50 and 3 years' imprisonment for the first degree murder (count IV) and AUUW (count XI) convictions, respectively.

¶ 18    On direct appeal, defendant contended that (1) the State's closing argument was improper, (2) he received ineffective assistance of trial counsel, (3) his aggregate 53-year sentence facially violated the eighth amendment of the United States Constitution, (4) his sentence violated the proportionate penalties clause of the Illinois constitution, and (5) his sentence was excessive. *Wilburn I*, 2019 IL App (1st) 153196-U, ¶ 2. The court held that his closing argument claim was forfeited and rejected his ineffective assistance claim. *Id.* ¶ 1. The *Wilburn I* court further held that his eighth amendment challenge, which was a facial challenge, failed because our supreme court had recently rejected this precise issue. *Id.* ¶¶ 94-95 (citing *People v. Harris*, 2018 IL 121932). Regarding his proportionate penalties claim, the court recounted that, similar to the defendant in *Harris*, (1) defendant here had failed to raise this claim in the trial court, (2) no evidentiary hearing was held, and (3) the trial court made no findings of fact. *Id.* ¶ 103. The court therefore held that, since defendant raised his challenge for the first time on direct appeal, the "appropriate forum [*sic*]" for the claim would be under either the Post-Conviction Hearing Act

(Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) or section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2016)). *Id.* ¶ 105.

¶ 19    With respect to his excessive sentence claim, however, the *Wilburn I* court observed that the trial court's comments regarding "defendant's choices and that he was raised to know better did not include a specific consideration of defendant's age." *Id.* ¶ 113. After noting that defendant had turned 18 years old within a month before the shooting, the court surmised that, "[t]hough technically not a juvenile, defendant's 'choices' may be considered to be reflective of his youth and immaturity." *Id.* After stating that a defendant's age is only one of various mitigating factors a trial court must consider, the court reiterated that there was "no indication that the trial court considered that defendant made those choices it decried due to his age." *Id.* The court then vacated his sentence and remanded the matter to the trial court for resentencing. *Id.*

¶ 20                                    Remand

¶ 21    On remand, the trial court appointed the public defender to represent defendant. On July 30, 2020, defendant filed a motion for a "full" resentencing hearing. Defendant's motion asked the court to allow arguments that his sentence violated both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Defendant stated that he was seeking the option to present testimony and evidence to support arguments that (1) the holding in *Miller* should apply to the defendant even though he was 18 at the time of the offense and (2) "his age and [the] facts of the case *** support a proportionate penalties argument." Defendant further stated that these arguments were forfeited in his direct appeal because previous counsel "did not present the necessary evidence."

¶ 22     On May 17, 2021, the trial court held a hearing on defendant's motion.  Defense counsel asked the court to allow him to present his eighth amendment and proportionate penalties challenges at any subsequent resentencing, arguing as follows:

"I think that the [court] is aware that at the time of the offense, the defendant was 18 years and under two months.  So he had just missed the line, Judge, that separates juvenile from adult in terms of sentencing and his ability to be protected by *** *Miller*[ *v. Alabama*, 567 U.S. 460 (2012)] and its prodigy [*sic*], so he missed it by two weeks.

Now, the Appellate Court did mention that had there been an evidentiary hearing in terms of his age and his youthfulness and all of those factors that *Miller* talks about, that then they could have looked at that, but they said because there wasn't that hearing or those findings of fact based on his age, that they're not going to look at the 8th Amendment or the proportionate penalties because there had never been an evidentiary hearing on those factors.  They gave Mr. Wilburn the option, obviously, Judge, of going through the PC prongs of those arguments.

             ***

I find it hard to believe that the Appellate Court would do such a thing.  To me, it's one of the most frustrating opinions I've ever read in the sense that they admit that he is just at the edge of that line of *Miller*, they admit that had there been a hearing on his

8

age that we could have made these arguments, but because there wasn't, because he is two months older than the age of 18, the most that [the court] is allowed to do is bring it down to 48 [years]."

Defendant further characterized the *Wilburn I* decision as both "absurd" and "a mistake."

¶ 23    In response, the State indicated that it agreed with "quite a bit" of defendant's argument, stating that "we know that you took [defendant's] age into consideration" and noting that defendant's PSI included defendant's age and social history. The State, however, argued that *Wilburn I* held that "the constitutional arguments should be heard in a post-conviction petition" and that this case was remanded for a "very, very narrow factual issue":  to indicate whether the court did in fact consider defendant's youth at the time of sentencing.

¶ 24    Following arguments, the trial court stated that, although it occasionally disagreed with an appellate court decision, "I would never say that they make an error." The court then found that the decision in *Wilburn I* remanded the cause "for a specific reason and that specific reason is what I will consider when we have any hearing." The court then denied defendant's motion, ordered a revised PSI be prepared, and continued the matter to August 26, 2021.

¶ 25    On August 26, 2021, the trial court ordered a behavioral clinical examination (BCX) of defendant. The court's written order indicated that the BCX was ordered "without [*sic*] bona fide doubt." On that same date, a revised PSI was filed with the court. The PSI again showed defendant's birthdate as September 14, 1995. On December 14, 2021, the BCX was filed with the court and found defendant "fit to stand trial." On January 18, 2022, the trial court entered an order finding defendant fit for trial.

¶ 26    The cause was then continued multiple times. Defendant moved to proceed *pro se* on November 29, 2022, which the trial court granted. Defendant, however, filed a *pro se* motion

claiming ineffective assistance of trial and appellate counsel on March 31, 2023. On April 28, 2023, the court entered an order stating that defendant's *pro se* motion was "not heard" and continued the cause to May 5, 2023. At the hearing on this motion, the court explained that defendant's *pro se* motion was premature and that the matter was before the court solely for resentencing. Defendant subsequently filed a motion for substitution of judge on May 12, 2023, which was denied on May 18, 2023. Defendant then sought re-appointment of counsel, which the court allowed on that same day.

¶ 27 The matter was then continued to June 26, 2023, but on that date, defendant refused to appear for the video hearing, so the court continued the matter to June 29, 2023. On that date, defendant apologized to the court and explained that he was not "avoiding the courtroom"; instead, he was avoiding his court-appointed attorney. Defendant said that he was not comfortable with proceeding with the resentencing hearing "without going over a full strategy plan with [his counsel]." The court indicated that it understood and accepted defendant's apology. The court stated that it would continue the matter again to July 10, 2023, but it stated that the hearing had "to go that day," and it would not grant a further continuance to either the State or defendant. The court further advised defendant that, even if he "decide[d] not to come up, we're still going forward that day." Defendant responded, "All right."

¶ 28 On July 10, 2023, the trial court held defendant's resentencing hearing on remand. Defendant again told the court that he wished to proceed *pro se*, which the court allowed following admonishments. The court stated it would proceed to resentencing, but defendant stated that he was not ready to proceed and asked for a continuance. The court denied defendant's request, reminding defendant that he had been informed at the prior court hearing "in front of the State and in front of [defense counsel]" that the case would not be continued past "today's date." The court

noted that the case had been "dragging on and on *** for sentencing only." The court further found that defendant's repeated "firing and accepting" of court-appointed counsel was merely a dilatory tactic. The matter then proceeded to arguments.

¶ 29    The State briefly argued that the case had been remanded for "a very narrow reason": for the trial court to acknowledge that it did consider defendant's youth at the time it sentenced defendant. The State added that it was "obvious" from the trial proceedings and original sentencing hearing that the court considered defendant's youth because it was a "center[]piece" of the trial and defendant's age was provided in his initial PSI that the court had reviewed at sentencing. The State asked the court to (1) acknowledge that it had considered defendant's youth, (2) take judicial notice of prior victim impact statements, and (3) "return *** defendant to the Illinois Department of Corrections for the original sentence of 53 years' incarceration."

¶ 30    Defendant then engaged in a lengthy argument. Defendant argued that there were various mitigating factors, including that Brandon had provoked defendant. Defendant further alleged that the assistant state's attorneys misstated the law of self-defense to the jury. Defendant also complained that his trial counsel was ineffective. Defendant argued that, in light of the factors in mitigation, the trial court should reduce his sentence to second-degree murder. Defendant further referenced "Unified Bill 3807," which he said required a court to consider certain mitigating factors when a person who is under 21 commits an offense. Defendant apologized to "these people" and his mother. He then said, "I'm sorry this man got killed" and repeatedly stated he did not want to kill Brandon. Defendant again complained of trial counsel's performance and added that he had mental health issues in prison. Defendant added that, while incarcerated, he completed anger management courses and "did a carpenter thing" for which he received a certificate. Finally,

defendant asked the court for a "less mitigating offense, but for sure to take the gun enhancement off," and to give him "some type of life."

¶ 31    Following arguments, the trial court stated that it had reviewed the revised PSI (which included defendant's date of birth), the victim impact statement, and the decision in *Wilburn I*. The court found that the case had been remanded "for a specific matter, not to relitigate the actions that you say the [s]tate's [a]ttorney made or relitigate the first versus second degree murder cases."

¶ 32    The court then recounted that, during the original sentencing hearing, it stated that defendant "should have known better." The court explained, "I did that because *** I did read the presentence investigation. And the reason I said you should have known better is because you came from a loving family, and I commented about that." The court further acknowledged that defendant had certain "juvenile problems" and had taken that into consideration. The court also stated, "I may not have specifically commented about your age, but I knew you were 18 years of age; because I read the presentence investigation."

¶ 33    After noting that, for the purposes of the resentencing hearing, it had considered all aggravating and mitigating factors, the court indicated that it "gave all the statutory factors in mitigation" and further considered the PSI, victim impact statement. The court then concluded that the original sentence was an appropriate sentence, and resentenced defendant to an aggregate 53 years' imprisonment, consisting of consecutive terms of 25 years' imprisonment for the first degree murder conviction, "25 years['] enhancement for the gun," and 3 years' imprisonment for the AUUW conviction.

¶ 34    The trial court then admonished defendant that, to avoid forfeiture when appealing his sentence, defendant first had to file a written motion to reconsider sentence within 30 days of the sentencing date. The court added, "Any grounds or basis not set forth in the motion cannot be

used on appeal, if the motion is denied." Defendant, however, did not file a motion to reconsider sentence. This appeal follows.

¶ 35                                    ANALYSIS

¶ 36    Defendant raises two claims before this court. First, he contends that the trial court erred in denying his motion for a full resentencing hearing, which would have allowed him to present a proportionate-penalties challenge. Second, he contends that his conviction for AUUW (predicated upon his prior juvenile delinquency adjudication) is unconstitutional both facially and as applied to him. We consider each claim of error in turn.

¶ 37                I. Defendant's Motion for a Full Resentencing Hearing

¶ 38    As noted above, defendant challenges the trial court's denial of his motion for a "full" resentencing hearing. Defendant states that he intended to present evidence and arguments supporting a sentence below the statutory minimum but that the court "seemed unaware" that the proportionate-penalties clause of the Illinois constitution "can allow a sentence below the minimum." Defendant concedes that none of these claims were raised at trial or in a post-trial motion and are therefore forfeited. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant, however, asks that we review this issue under the plain error doctrine.

¶ 39    The plain error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 185-87 (2005). In the first instance, the defendant must prove "prejudicial error." *Id.* at 187. By contrast, in the second instance, prejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence. *Id.* In the latter situation, the defendant must prove that "there was plain error and that the error was so serious

13

that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.* However, before considering whether the plain-error exception applies, we must first determine whether any error occurred. *Id.*

¶ 40    Although defendant claims that the trial court erred in denying his request to present a proportionate penalties challenge, the court's denial was predicated upon its statement that the *Wilburn I* court remanded the cause "for a specific reason," namely, whether the court considered defendant's age when it sentenced defendant to an aggregate 53-year term of imprisonment. This claim thus turns upon whether the trial court correctly interpreted the mandate in *Wilburn I*.

¶ 41    The law is well established that, when a reviewing court issues a mandate, it vests the trial court with jurisdiction to take "only such action as conforms to that mandate." *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276 (1982). "Any other order issued by the trial court is outside the scope of its authority and void for lack of jurisdiction." *Id.* at 276-77. Even where the reviewing court's directions are erroneous, the trial court must nevertheless "strictly follow those directions." *Id.* at 277. Whether the trial court's action on remand was correct is determined from the appellate court's mandate and not the appellate court opinion. *PSL Realty Co. v. Granite Inv. Co.*, 86 Ill. 2d 291, 308 (1981). Precise and unambiguous directions in a mandate must be obeyed. *Schreier*, 92 Ill. 2d at 276. If, however, the direction is to proceed in conformity with the opinion, "then, of course, the content of the opinion is significant." *PSL Realty*, 86 Ill. 2d at 308; see also *People v. Palmer*, 148 Ill. 2d 70, 81 (1992). Whether the trial court has acted within the bounds of the remand is a question of law; accordingly, our standard of review is *de novo*. *Garley v. Columbia LaGrange Hospital*, 377 Ill. App. 3d 678, 681 (2007) (citing *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 351-52 (2002)).

¶ 42    Here, the trial court did not err in denying defendant's motion for a full resentencing hearing. With respect to defendant's eighth amendment challenge, the *Wilburn I* court noted that defendant was 18 years old at the time he shot Brandon, and therefore, pursuant to *People v. Harris*, 2018 IL 121932, "his challenge to his 53-year sentence under the eighth amendment fails." *Wilburn I*, 2019 IL App (1st) 153196, ¶ 95. Next, the court brushed aside defendant's proportionate penalties claim, holding that, since defendant failed to raise his proportionate penalties challenge to his sentence in the trial court, no evidentiary hearing was held, and no findings of fact were made by the trial court, his proportionate penalties claim "would be more appropriately raised in proceedings under the Act or under section 2-1401 of the Code." *Id.* ¶ 103.

¶ 43    With respect to his excessive sentence claim, however, the *Wilburn I* court stated that the "trial court's comments *** did not include a specific consideration of defendant's age." *Id.* ¶ 113. After noting that defendant had turned 18 less than one month prior to the shooting (and thus was no longer a juvenile), the court nonetheless held that defendant's " 'choices' " may be considered to be reflective of his youth and immaturity and there was no indication that the trial court considered that "defendant made those choices it decried due to his age."[4]   *Id.*   In that same paragraph, the court then vacated defendant's sentence and remanded for resentencing. *Id.*

¶ 44    Although the *Wilburn I* court did not explicitly state it, the unmistakable inference is that the court remanded the cause for resentencing solely for the trial court to fashion a sentence in which it would consider defendant's relatively young age. As such, the trial court had jurisdiction

---

[4] The *Wilburn I* court's use of quotation marks when referring to defendant's choices is puzzling. To be clear, the transcript reveals that the trial court never used that precise term, and thus never "decried" any such purported choices. We do note, however, that the transcript indicates that *the State* repeatedly referred to defendant having made various choices for which he should suffer the consequences in its rebuttal closing argument. The *Wilburn I* court recognized this earlier in its decision. See *id.* ¶ 61.

only to act in conformity with that mandate, and any other order would have been outside the scope of its authority and void for lack of jurisdiction. See *Schreier*, 92 Ill. 2d at 276-77. Even if the *Wilburn I* court's direction was erroneous, the court was nonetheless bound to strictly follow those directions. See *id.* at 277.

¶ 45    Upon remand, the trial court acknowledged that it may not have specifically commented on defendant's age, but it knew he was 18 years old at the time of the offense because it read the PSI prior to the original sentencing hearing. We note that (1) defendant's date of birth was squarely stated on the first page of both the original PSI and the revised PSI that was prepared for the resentencing hearing and (2) it is a firmly rooted presumption that a trial court has considered all mitigating evidence before it, absent some indication to the contrary other than the sentence itself. *People v. Thompson*, 222 Ill. 2d 1, 45 (2006) (citing *People v. Burton*, 184 Ill. 2d 1, 34 (1998)). At resentencing, the court stated that it had read the revised PSI and considered all mitigating and aggravating factors, and it then reimposed the same sentence. Therefore, the trial court did not err in denying defendant's motion for a full resentencing hearing, and we must decline to review this matter under the plain error doctrine. See *Herron*, 215 Ill. 2d at 187. Consequently, defendant's first claim of error is unavailing.

¶ 46    Although defendant devotes a substantial portion of his brief to an argument that his sentence violates the proportionate penalties clause of our state constitution (Ill. Const. 1970, art. I, § 11), we agree and reaffirm the *Wilburn I* court's holding that this argument, among others, is more appropriately raised in another proceeding such as a petition brought pursuant to the Act or section 2-1401 of the Code. See *Wilburn I*, 2019 IL App (1st) 153196, ¶ 105; see also *Harris*, 2018 IL 121932, ¶ 48. We express no opinion on the arguments that defendant provides here.

¶ 47                    II.  Defendant's Constitutional Challenges

¶ 48     Defendant also contends that the AUUW statute under which he was convicted (section 24-1.6(a)(1), (3)(D) of the Criminal Code of 2012) is unconstitutional both facially and as applied to him pursuant to the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).  Defendant argues that there is "no historical analogue" for subsection (3)(D), which prohibits the possession of a weapon by an individual who has a prior juvenile delinquency adjudication for an act that would have been a felony if committed by an adult.  Therefore, according to defendant, we must reverse his conviction pursuant to the holding in what he terms a "categorical ban on the right to bear arms based solely on a prior juvenile adjudication."  The State responds that defendant's as-applied claim is forfeited and in any event all of his claims are meritless.

¶ 49     Our review begins with the presumption that section 24-1.6(a)(1), (3)(D) is constitutional, and we must construe that section as constitutional if reasonably possible to do so.  *People v. Garvin*, 219 Ill. 2d 104, 116 (2006).  "As the challenger in this case, defendant bears the heavy burden of demonstrating a clear constitutional violation."  *Id.*  The constitutionality of a statute presents a question of law that we review *de novo.  Id.*

¶ 50     Defendant claims the statute violates the second amendment on its face and as applied to him.  To mount a successful facial challenge, a defendant must show that the statute violates the constitution under *any* set of facts.  *Id.* at 117.  By contrast, an "as applied" challenge requires a defendant to show the statute violates the constitution as it applies to him, *i.e.*, under the specific facts of his case.  *Id.*  Accordingly, if defendant's "as applied" challenge to the validity of section 24-1.6(a)(1), (3)(D) fails, his facial challenge to that section necessarily fails because the statute is constitutionally valid under at least one set of facts.  *Id.* at 125.  On this point, it should be noted

that it is of no consequence that the challenged statute might operate unconstitutionally under some conceivable set of facts because our supreme court and the United States Supreme Court have not recognized an "overbreadth" doctrine outside of the limited context of the first amendment. See *In re C.E.*, 161 Ill. 2d 200, 211 (1994) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). We now turn to defendant's "as applied" challenge to section 24-1.6(a)(1), (3)(D).

¶ 51    Defendant argues that section 24-1.6(a)(1), (3)(D) (criminalizing the possession of a weapon by a person with a prior juvenile delinquency adjudication for an offense that would have been a felony if committed by an adult) as applied to him violates the second amendment of the federal constitution. The second amendment provides as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The second amendment is applicable to the States via the due process clause of the fourteenth amendment. U.S. Const., amend. XIV; *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

¶ 52    Defendant bases his as-applied constitutional challenge to section 24-1.6(a)(1), (3)(D) on *Bruen*. In that case, the Court set forth a new test for evaluating laws that potentially implicate the second amendment. *Bruen*, 597 U.S. at 17-18. The Court first recognized that, since its prior decision in a different second amendment case, lower courts had developed a two-pronged analysis to determine whether statutes regulating firearms ran afoul of the second amendment. *Id.* at 17 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008)). The first prong required "a textual and historical inquiry" concerning whether the regulated activity fell within the scope of the second amendment. *Id.* at 17-18. The second prong then concerned whether the challenged law affects a core second amendment right; if so, then strict scrutiny would apply, otherwise, intermediate

scrutiny would apply, which requires the government to show that the challenged law is substantially related to an important governmental interest. *Id.* at 18-19.

¶ 53    Although it described the lower courts' two-pronged test as "one step too many," the *Bruen* Court nonetheless proceeded to establish a new two-pronged test. *Id.* at 19. The Court stated that the first prong of its new two-pronged approach is "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* The second prong would then require the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* The Court summed up its new two-pronged test as follows:

> "When the Second Amendment's plain text covers an individual's
>
> conduct, the Constitution presumptively protects that conduct. The
>
> government must then justify its regulation by demonstrating that it
>
> is consistent with the Nation's historical tradition of firearm
>
> regulation." *Id.* at 24.

The Court then held, "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 24.

¶ 54    In this case, defendant's as-applied challenge is without merit. As a preliminary matter, there have been numerous courts holding that defendant's status as a convicted felon takes him out of the protections of *Bruen* and its antecedents.[5] See, *e.g.*, *People v. Kelley*, 2024 IL App (1st)

---

[5] Although defendant is challenging the constitutionality of section 24-1.6(a)(1), (3)(D), he does not claim that his juvenile adjudication for robbery should be treated differently from an adult criminal conviction for robbery on this issue. His brief omits any difference between his juvenile adjudication and "felony conviction," which results in the forfeiture of any such argument. See Ill. S. Ct. R. 341(h)(7) (Oct. 1, 2020).

230569, ¶ 22, *pet. for leave to appeal pending*, No. 130821 (filed June 27, 2024); *People v. Mobley*, 2023 IL App (1st) 221264, ¶¶ 27-28 ("*Bruen* strongly suggests the test only applies when a regulation impacts a law-abiding citizen's ability to keep and bear arms") , *pet. for leave to appeal pending*, No. 130417 (filed Jan. 31, 2024); *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37 ("The *Bruen* Court could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant. *Bruen*, 597 U.S. at 71 \*\*\*. Just in case a reader missed the first time that the court said it, the court repeated it 18 times."), *pet. for leave to appeal pending*, No. 130174 (filed Nov. 3, 2023); *People v. Burns*, 2015 IL 117387, ¶ 41 (Garman, C.J., specially concurring, joined by Thomas, J.) ("the right secured by the second amendment is held by 'law-abiding, responsible citizens' and is not unlimited" (quoting *Heller*, 554 U.S. at 635)). Other courts, however, have held that the plain language of the second amendment does not exclude felons under *Bruen*'s first prong and that a defendant's felony conviction should be evaluated under the historical tradition analysis set out in *Bruen*'s second prong. *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 89, *pet. for leave to appeal pending*, No. 130153 (filed Oct. 30, 2023); *People v. Travis*, 2024 IL App (3d) 230113, ¶ 26, *pet. for leave to appeal pending*, No. 130153 (filed May 16, 2024); *People v. Stephens*, 2024 IL App (5th) 220828, ¶ 29. Under either standard, defendant's claim fails.

¶ 55    Under the first prong, whether the plain language of the second amendment is implicated by section 24-1.6(a)(1), (3)(D), defendant was adjudicated a ward of the court for the offense of robbery, a forcible felony. As noted, the second amendment protects the right of "the people" to keep and bear arms, so we must determine whether a convicted felon is a member of the protected class of "the people" in the second amendment. Defendant argues that his possession of a firearm is "presumptively protected" because, in his view, the second amendment protects the right of "the

people" and not merely "law-abiding citizens" to keep and bear arms. The precise section of *Heller* that defendant cites, however, concerned whether the second amendment's right to bear arms bestowed a collective right (*i.e.*, limited to members of a "militia") or an individual right. See *Heller*, 556 U.S. at 577-81 ( "Reading the Second Amendment as protecting only the right to 'keep and bear Arms' in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as 'the people.' "). Furthermore, the main opinion in *Heller* later clarifies that "*nothing* in our opinion *should* be taken to *cast doubt on longstanding prohibitions on the possession of firearms by felons* and the mentally ill, ***." (Emphases added.) *Id.* at 626-27. We therefore reject defendant's reading of *Heller* and agree with those cases holding that "the people" referred to in the second amendment are "law-abiding, responsible citizens." See *id.*

¶ 56 In any event, even assuming, *arguendo*, that a defendant's right to keep and bear arms is presumptively protected, *i.e.*, it passes muster at the first prong of the *Bruen* test (see, *e.g.*, *People v. Brooks*, 2023 IL App (1st) 200435), defendant's delinquency adjudication for what would have been a felony offense (again, were it committed by an adult) forecloses his ability to lawfully possess a weapon because of the long-standing historical prohibition on felons possessing weapons. See *Heller*, 554 U.S. at 626-27; *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill, ***.' [Citation.] We repeat those assurances here."); see also *United States v. Rahimi*, 602 U.S. ----, 144 S. Ct. 1889, 1902 (2024) (reiterating the holding in *Heller* that laws prohibiting felons to possess weapons were " 'presumptively lawful' " and further stating that *Bruen* "also does not help [the defendant]").

¶ 57 Defendant attempts to avoid this result by distinguishing between violent and non-violent felonies. Specifically, he claims that there is no historical tradition prohibiting nonviolent

21

offenders from possessing firearms. He admits that an element of robbery is either the use, or a threat of the imminent use, of force. He nonetheless argues that, when the legislature removed the offense as an enumerated crime of violence under the Drug Court Treatment Act (730 ILCS 166/20(b)(4) (West 2022)), that evinced a legislative determination that robbery is not a crime warranting "permanent disarmament." We disagree.

¶ 58    First, neither *Heller*, *Bruen*, nor *Rahimi* qualified the term "felon" or otherwise limited it to violent felons. Moreover, this court has thoroughly examined—and rejected—this precise argument, concluding that "founding-era historical record and Supreme Court precedent support the ability of our legislature to prohibit firearm possession by people who have demonstrated disrespect for legal norms of society." (Internal quotation marks removed.) *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 92-100 (subsequently rejecting the defendant's as-applied challenge on the armed habitual criminal statute on the basis that his prior felony convictions were nonviolent because the prior felony convictions, "albeit nonviolent ones," indicate that "he is not a law-abiding citizen"). As one federal appellate court stated, "Felonies encompass a wide variety of non-violent offenses, and we see no reason to think that the [*Heller*] Court meant 'dangerous individuals' when it used the word felon." *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019). Defendant provides no compelling argument that we should disregard this authority. Since defendant cannot meet both prongs of *Bruen*, his as-applied challenge must fail.

¶ 59    Nonetheless, defendant relies upon a federal appellate decision, *Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023), in support of his claim. Defendant's reliance upon *Range*, however, is misplaced. At the outset, *Range* is no longer good law. Subsequent to the filing of defendant's reply brief, the United States Supreme Court entered an order vacating the judgment in *Range* and remanding the case to the federal appellate court for further

consideration in light of *Rahimi*. See *Garland v. Range*, 144 S. Ct. 2706, (Mem) (2024). Setting aside the fact that decisions of lower federal courts do not bind this court (see *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 302 (2001)), the *Range* defendant was convicted of a misdemeanor. *Range*, 69 F.4th at 98. Here, by contrast, defendant was adjudicated for an offense that would have been a forcible felony (*i.e.*, robbery) if it were committed by an adult. The statute at issue here does not prohibit possession of a weapon when the underlying juvenile adjudication was merely a misdemeanor. *Range* is therefore unavailing.

¶ 60 Since we have held that section 24-1.6(a)(1), (3)(D) is constitutional as applied to defendant, his second amendment facial challenge to that section necessarily fails because under at least one set of facts the statute is constitutionally valid and the "overbreadth doctrine" is inapplicable outside of first amendment challenges. See *C.E.*, 161 Ill. 2d at 211.

¶ 61                                    CONCLUSION

¶ 62 We reject defendant's claim that the trial court erred in denying his motion for a full resentencing hearing, which included a request to raise a proportionate penalties claim. We further hold that the statute prohibiting the possession of a weapon by an individual with a prior juvenile adjudication is not unconstitutional either facially or as applied to defendant. Accordingly, we affirm the judgment of the trial court.

¶ 63 Affirmed.

¶ 64 REYES, J., specially concurring:

¶ 65 I concur with the majority's disposition and analysis with respect to defendant's sentencing claim, and I further join in the disposition of defendant's constitutional claim. I write separately, however, as I do not fully agree with the analysis of the latter claim. Specifically, I do not agree

with the majority's discussion of the impact of a defendant's status as a convicted felon on the second amendment analysis.

¶ 66    As the majority observes, courts take two general approaches in considering a defendant's felon status.  Under one approach, courts have found that the second amendment applies only to "law-abiding citizens" and, therefore, a defendant's status as a convicted felon removes him from the scope of *Bruen*'s protections.  See *supra* ¶ 54 (citing *Kelley*, 2024 IL App (1st) 230569, ¶ 22; *Mobley*, 2023 IL App (1st) 221264, ¶¶ 27-28; *Baker*, 2023 IL App (1st) 220328, ¶ 37; *Burns*, 2015 IL 117387, ¶ 41 (Garman, C.J., specially concurring, joined by Thomas, J.)).  Under the other approach, courts have found that the first prong of the *Bruen* analysis does not automatically exclude felons, and that a defendant's felon status is more properly considered in the second prong of the *Bruen* analysis.  See *id.* (citing *Brooks*, 2023 IL App (1st) 200435, ¶ 89; *Travis*, 2024 IL App (3d) 230113, ¶ 26; *Stephens*, 2024 IL App (5th) 220828, ¶ 29).  The majority recognizes these different approaches, but indicates that "[u]nder either standard, defendant's claim fails." *Id.*  It then proceeds, however, to effectively adopt the first approach by expressly "agree[ing] with those cases holding that 'the people' referred to in the second amendment are 'law-abiding, responsible citizens' " (*supra* ¶ 55).  To the extent, then, that the majority's analysis may be interpreted as approving of the first approach, I cannot join in its analysis.

¶ 67    As I recently explained in *People v. Doehring*, 2024 IL App (1st) 230384, ¶¶ 24-26, the United States Supreme Court's decision in *United States v. Rahimi*, 602 U.S. 680 (2024), suggests that a focus on an individual's status is appropriate at the second stage of the *Bruen* analysis, not as a threshold inquiry.  Accordingly, in my view, the first approach is foreclosed by *Rahimi*, as the Supreme Court expressly rejected such an analysis in that case.

¶ 68    In *Rahimi*, the Supreme Court addressed the framework for second amendment claims for the first time since its *Bruen* decision, in the context of analyzing a firearm restriction against an individual subject to a domestic violence restraining order. *Id.* at 700.  After doing so, it noted that the government had argued that the petitioner could be disarmed where he was not " 'responsible.' "    *Id.* at 701.    The Supreme Court rejected this argument, observing: " 'Responsible' is a vague term.  It is unclear what such a rule would entail.  Nor does such a line derive from our case law." *Id.*  Specifically, the Supreme Court noted that "[i]n *Heller* and *Bruen*, we used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right.  [Citations.]  But those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.'  The question was simply not presented." *Id.* at 701-02.

¶ 69    The Supreme Court has thus made clear that the fact that an individual is not " 'responsible' " does not automatically place him outside the scope of the second amendment's protections.  *Id.* at 701.  To the extent that the cases cited by the majority use the term "law-abiding" instead of "responsible," such a distinction is without a difference.  As with the term "responsible," the term "law-abiding" is not defined by the Supreme Court's second amendment jurisprudence and neither *Heller* nor *Bruen* contains any discussion of the status of citizens who were not "law-abiding."   Indeed, both the *Heller* and *Bruen* courts addressed "law-abiding, responsible citizens," not merely "responsible citizens," suggesting that the two terms are interpreted similarly.  See *Bruen*, 597 U.S. at 70; *Heller*, 554 U.S. at 635.

¶ 70    I also observe that even the author of *Bruen* has made clear his disapproval of this type of threshold inquiry.  In his dissent in *Rahimi*, Justice Thomas indicated that the government's claim that the second amendment was limited to " 'responsible' and 'law-abiding' " citizens "lacks any

basis in our precedents and would eviscerate the Second Amendment altogether." *Rahimi*, 602 U.S. at 773 (Thomas, J., dissenting). While not binding, the fact that the author of *Bruen* has disavowed this interpretation suggests that the reliance on *Bruen*'s language to support a threshold inquiry may be placing weight on that language which it was not intended to bear. Thus, I see no way to reconcile the Supreme Court's analysis in *Rahimi* with the imposition of a threshold inquiry as to an individual's status as a felon.

¶ 71    Finally, unlike the majority, I do not read the *Heller* Court's statement that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" (*Heller*, 556 U.S. at 626-27) as support for a threshold inquiry. See *supra* ¶ 55. Instead, this statement is wholly consistent with a straightforward application of the two-part *Bruen* analysis, as the second step of that analysis asks whether there is a historical tradition of a particular firearm restriction. See *Bruen*, 597 U.S. at 24. As the majority explains in its discussion of the *Bruen* analysis, there is a historical tradition of prohibiting felons from possessing firearms, so the statute at issue in this case is constitutionally permissible under *Bruen*. See *supra* ¶¶ 56-59.

¶ 72    In sum, I agree with the majority's ultimate decision as to the constitutionality of the statute prohibiting felons from possessing firearms. In my view, however, this inquiry should be conducted by applying the two-part *Bruen* analysis, not by automatically excluding an individual based on his status as a convicted felon. As the majority's decision may be read to support the latter approach, I write separately to clarify my view of the appropriate analysis.